THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN BLAKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-193 |
| | ) | |
| UPMC PASSAVANT HOSPITAL, | ) | Judge McVerry |
| JOE KUZMA, individually and in his | ) | Magistrate Judge Hay |
| capacity as a Department Supervisor with | ) | |
| UPMC Passavant Hospital and | ) | |
| BRIAN KOOROS, individually and in his | ) | |
| capacity as a Human Resources | ) | |
| Representative with UPMC Passavant | ) | |
| Hospital, | ) | |
| | ) | |
| Defendants. | ) | |

## I.  RECOMMENDATION

It is respectfully recommended that the motion for summary judgment (Docket #26 ) filed on behalf of defendants be granted.

## II.  REPORT

Plaintiff John Blake ("Blake") filed a five count complaint against his former employer, UPMC Passavant Hospital ("UPMC"), a wholly-owned subsidiary of the University of Pittsburgh Medical Center, and two hospital employees,  Joe Kuzma ("Kuzma"), the administrative manager of the hospital laboratory, and Brian Kooros ("Kooros"), a UPMC Human Resources Representative, alleging discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2005) ("ADA") and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 (1991 )("PHRA"), interference with and retaliation for exercise of the rights afforded under the Family and Medical Leave Act of 1993, 29 U.S.C. §§

2601-2654 (1999) ("FMLA"), intentional infliction of emotional distress, and wrongful

discharge. Defendant UPMC moves for summary judgment on all counts asserting generally that

Blake cannot establish a *prima facie* case to support any of the legal theories for recovery alleged

in his complaint. Defendants Kuzma and Kooros argue that they are additionally entitled to

summary judgment because: (1) there is no provision for individual liability under the ADA and

exists in only circumscribed situations under the PHRA; (2) the ADA, PHRA, and FMLA claims

are derivative of the actions against UPMC; and, (3) Blake cannot establish either a *prima facie*

case of intentional infliction of emotional distress or retaliatory discharge against them.

      A. <u>Standard of Review</u>

      Summary judgment is warranted only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c). Under Rule 56, summary judgment will be entered against a

party who cannot sufficiently demonstrate the existence of an element essential to its case on

which it will bear the burden of proof at trial. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322

(1986). In evaluating the evidence at the summary judgment stage, the court interprets the facts

in the light most favorable to the non-moving party, and draws all reasonable inferences in its

favor. <u>Watson v. Abington Township</u>, 478 F.3d 144, 155 (3d Cir. 2007). The initial burden is on

the moving party to demonstrate that the record evidence creates no genuine issue of material

fact. <u>Conoshenti v. Public Service Electric & Gas Company</u>, 364 F.3d 135, 140 (3d Cir. 2004);

the dispute is genuine if a reasonable jury could return a verdict for the non-moving party.

<u>McGreevy v. Stroup</u>, 413 F.3d 359, 364 (3d Cir. 2005). The party moving for summary

judgment, however, may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial.  Lehman v. U.S. Steel Corporation, No. 05-1479, 2007 WL 2728659, at *2 (W.D.Pa. September 17, 2007) (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989)).

   B.  Facts

The following facts are undisputed:

Blake began working for UPMC Health System Diversified Services as a private duty aide on or about December 12, 2002.  On August 11, 2003, he transferred into a phlebotomist position at UMPC Passavant Hospital and began a 180-day introductory employment period, training to perform phlebotomy and specimen collection from both inpatients and outpatients.  On three occasions between August 18,  2003  and October 1, 2003, Blake notified UPMC that he would be absent from work.  On October 2, 2003, Kuzma, the laboratory manager, met with Blake concerning his absenteeism and provided him with a copy of UPMC's attendance policy.  The policy stated that employees in their introductory period receive a  verbal warning after their  first absence and a written warning after a second absence.  After a third infraction of the policy, the employee is discharged.  Defendant's Appendix in Support of Motion for Summary Judgment, Exhibit 18 (Document #29-2).  When Blake explained that medical problems impeded his ability to work on certain days, Kuzma suggested that he apply for a medical leave.

On October 6, 2003, Blake submitted a request for a leave, supported by a FMLA Certification of Health Provider Form from his family physician, Dr. F.J. Landenwitsch.  Dr. Landenwitsch described Blake as suffering from depression and a learning disorder that would

require an occasional day off from work. The physician also reported that Blake's condition was chronic and that episodes of incapacity could occur three to four times a year. Blake confirms that his mental health condition is permanent and expects it to last his lifetime.

Blake's leave request was approved, allowing him to take unscheduled intermittent days off for a twelve-week period. Although the leave was designated as having been granted pursuant to the provisions of FMLA, such characterization was later determined to be erroneous as Blake had not yet worked the requisite number of hours to be eligible for FMLA leave. During the twelve-week period, Blake was absent from work on ten days, although none of these absences were counted against his attendance record. Blake then applied for and was granted an extension of his leave from December 26, 2003 through March 19, 2004. After Blake missed three more days of work in early January, Kooros informed him that the leave had been improvidently granted and was being revoked. At this point, Blake related that he had bipolar disorder and needed certain accommodations to successfully perform his job. Kooros told Blake that his request would be considered after Blake submitted the required supporting medical documentation. When Blake called in sick the following day, he received a verbal warning concerning this absence.

On January 21, 2004, Blake penned a letter to Kuzma and Kooros, describing his disability and requesting an accommodation as follows:

> One, is my problem of becoming overwhelmed when a demanding day is due to confusion, being understaffed or set backs due to communication errors. This takes a toll on me emotionally and I suffer from a panic attack. I am fearful I will make an error, forget something or not get my request finished by the end of the work day. My anxiety disorder then caused tiredness, and depression. With days of this demand I require an unexpected day of rest, to relax and regroup. This accommodation may

4

occur prior to scheduled days off.

Second, is my learning disability in which I require additional hands on training as an accommodation, to complete alternate task requested of me that I may not have been trained to perform.

Defendant's Appendix, id. at Exhibit 13. UPMC agreed to extend Blake's introductory period to afford him further training, but notified Blake that it needed additional medical documentation to purposely review his petition for unscheduled days off as an accommodation.

On February 2, 2004, Blake again missed work. When he returned the following day, he provided Kooros with a note from Dr. Landenwitsch, stating summarily that Blake had a history of chronic learning disability and recurrent depression. On February 4, 2004, Kooros informed Blake that his physician's note did not include enough information to evaluate the accommodation request.[1] A few days later, Blake, by letter, petitioned Kooros for a written explanation of the corroboration needed to pursue the matter.

Blake missed work on February 9, 12, and 18, 2004. On February 19, Kooros presented Blake with a written request for release of his medical records and for a specific description of Blake's medical diagnosis. The letter also asked for a detailing of the scope of Blake's restrictions and the extent of the modifications required to accommodate his limitations. Given that Blake's accommodation request was pending, Kooros did not discipline Blake for his February absences up to the date. Kooros's letter cautioned, however, that absences dating back to January 30, 2004, would be deemed unexcused if Blake failed to comply with its dictates by

---

[1] On this same date, Shari Hoey, Blake's immediate supervisor, submitted her 180-day evaluation of Blake. The evaluation pointed out that Blake's job performance was compromised by his absenteeism and it was agreed that Blake's introductory period should be extended another month.

February 23, 2004.

Blake answered with a one paragraph note dated February 20, 2004, from Dr. Landenwitsch, reiterating that Blake "has a history of depression and learning disability" and succinctly opining that Blake "would likely need more time than average to complete a task.  I also think he will need occasional days off due to a history of depression."  Id. at Exhibit 17. Kooros followed up with a letter to Dr. Landenwitsch, explaining that UPMC needed a written clinical diagnosis of Blake's medical condition in order to assess if a job modification was mandated.  Dr. Landenwitsch did not respond.

Blake missed work on February 24, 2004 and received a written warning, alerting him that another absence could result in his discharge.  After a subsequent absence on March 3, 2004, Blake was terminated.

C. ADA and PHRA Counts

These counts are addressed in tandem because analysis of the ADA cause of action  against UPMC mirrors that of the PHRA claim.  Taylor v. Phoenixville School District, 184 F.3d 296,  306 (3d Cir. 1999).  Regarding the individual defendants, their blanket statement that personal liability does not exist under the ADA is supported by indirect authority in this Circuit.[2]  However, given that Blake does not challenge this  position and considering that the

---

[2]  In Koslow v. Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002), the Court of Appeals for the Third Circuit noted in dicta that "there appears to be no individual liability for damages under Title I of the ADA."  In a more recent case, involving whether the Federal Reserve Act preempted New Jersey state employment discrimination law, the appeals court, in the confined context of comparing the broad sweep of the state law to its federal counterparts, cited this non-binding Koslow language for the proposition that no individual liability attaches under the ADA.  See Fasano v. Federal Reserve Bank of New York, 457 F.3d 274, 289 (3d  Cir. 2006).  Neither case, however, announces a firm rule on the personal liability issue.

consensus view among the district courts is that no individual liability exists, see McQuaid v. Acts Retirement Communities Southampton Estates, No. Civ. A. 04-3620, 2005 WL 2989642, at *2 (E.D.Pa. August 8, 2005)(collecting cases finding no individual liability under ADA), it is concluded that Kuzma and Kooros are exempt from personal liability under the ADA.

In contrast, individuals may be held liable in some instances for violations of the PHRA. 43 P. S. § 955(e) forbids "any person . . . or employe, to aid , abet, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . ." In the instant matter, the complaint does not allege that the individual defendants aided or abetted a PHRA violation, nor does Blake offer any argument that individual liability attaches under the state statute. Thus, the averments included in counts one and two of the complaint are discussed to the extent that they are actionable against UPMC only.

Blake's ADA claims are reviewed by reference to the familiar McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) burden-shifting analysis. Under this framework, the plaintiff has the initial burden of establishing a *prima facie* discrimination case. If successfully demonstrated, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its challenged action. The onus of proof then returns to the plaintiff to show that the employer's proffered explanation is a pretext. See Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d Cir. 1996) (now axiomatic that Title VII McDonnell Douglas analytical framework also guides analysis of ADA claims).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that he (1) has a disability; (2) is a qualified individual; and, (3) has suffered an adverse employment decision as a result of discrimination based on a disability. Turner v. Hershey

<u>Chocolate U.S.</u>, 440 F.3d 604, 611 (3d Cir. 2006).

      1.  <u>Is Blake disabled?</u>

For purposes of the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "major life activity" includes "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. §1630.2(I), or, as described by <u>Marinelli v. City of Erie, Pa.</u>, 216 F.3d 354, 361 (3d. Cir. 2000), those basic activities that an average person performs with little or no difficulty. The regulations likewise give meaning to the phrase "substantially limits." Under 29 C.F.R. § 1630.2(j)(1)(I)-(ii) an individual is substantially limited if he is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." <u>Id.</u>; <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184, 198 (2002). Courts are instructed to consider the following factors to determine whether a particular condition substantially limits a major life activity: "[t]he nature and severity of the impairment; [t]he duration or expected duration of the impairment; and [t]he permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment. § 1630.2(j)(2)(I)-(iii)." <u>Toyota</u>, 534 U.S. at 196. A disability determination is an individualized inquiry to be decided on a case-by-case basis. <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 483 (1999).

Blake contends that his impairments of depression, learning disability and/or bipolar disorder substantially limit his major life activities of thinking and cognitive processes and caring for himself. To support his claim of disability, Blake first offers the information provided to UPMC from his primary care physician. Dr. Landenwitsch's letter related that Blake's depression and learning disorder necessitated that he be afforded more time than the average person to learn new skills and to complete tasks. He also opined that Blake needed occasional days off from work because of his history of depression.

Blake next submitted an affidavit from his stepfather, John Lesneski, detailing Blake's low IQ and his assignment to special education classes during his school years. Mr. Lesneski confirmed that Blake needed additional time to complete tasks and explained that fatigue was a side effect of his medications. Mr. Lesneski also attested to occasions when Blake's bipolar disorder left him unable to function for up to a day.

The bulk of the evidence supporting Blake's claim of disability originates from his deposition testimony. Blake testified that he has been treated for depression, learning disability, and bipolar disorder by primary care and other physicians specializing in mental health disorders. He averred that his condition is permanent and that treatment ranges from medication therapy to hospitalizations. In addition to the description of the debilitating effects of his disability in the January 21, 2004 letter to Kuzma and Kooros, Blake depicted its impairment on his thinking and personal maintenance as follows:

> I get paranoid very easy. I don't want to do things. There's days that it's a struggle to get out of bed. It's a struggle to get a shower. It's a struggle to eat. There's many days that I've slept for 24, 48 hours and only got up to go to the bathroom.

Plaintiff's Appendix in Opposition to Motion for Summary Judgment, Exhibit 5, (Document # 38-5). Blake also testified to occasional impulsive behavior such as compulsive spending and random driving without apparent destination.

Certain undisputed record facts argue against a finding of substantial limitation. Blake rents his residence, has held a number of jobs, socializes with his family, and attended and received a degree from a community college. Additionally, the medical evidence, originating solely from his family physician, is abbreviated and vague. Nonetheless, viewing the facts favorably to Blake, and accepting that the issue of disability is primarily a factual one, see Khalil v. Rohm and Haas Company, Civil Action No. 05-3396 , 2008 WL 383322, at *8 (E.D.Pa. February 12, 2008) (if not entirely factual, disability issue is at minimum mixed question of fact and law), there is sufficient evidence from which a jury conceivably could conclude that Blake is disabled. Per the favorable testimony, there are times when he cannot attend to his basic needs and when his cognitive processes are clouded. Thus, there is a genuine issue of fact as to whether Blake's learning disability and depression substantially limit his major life activities.

## 2. Is Blake a Qualified Individual?

The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Employees seeking qualified individual status must demonstrate that they possess the requisite skills and requirements of the subject employment position and that they, "with or without reasonable accommodation, can perform the essential functions of the position held or sought."

Skerski v. Time Warner Cable Company, 257 F.3d 273, 278 (3d Cir. 2001). UPMC asserts that Blake cannot establish that he is a qualified individual because his need for unscheduled days off is antagonistic to an essential function of a phlebotomist position, namely, regular attendance to respond to patient needs.

During Blake's eight-month employment at UPMC, he missed work on twenty-five days. When the instances occurring during his approved leave are excluded, Blake was absent eleven times. All these absences occurred during Blake's introductory period when, according to the UPMC attendance policy, only three are tolerated before termination. Blake concedes that courts do not require employers to tolerate excessive absenteeism, but submits that this is a fact-based issue that can rarely be decided as a matter of law. Blake then argues that the record, viewed favorably to him, would not require a jury to determine that he was unqualified because of his absenteeism by challenging UPMC's characterization of certain of his absences. Specifically, Blake contends that the otherwise-mandated three absence rule had been suspended as applied to him and that a factual question exists as to when he became entitled to FMLA benefits.

It would appear initially that Blake's assertion that he is a qualified individual under the ADA is in essence an offshoot of his FMLA claim, discussed *infra*. Blake, however, saves his ADA claim from relegation to discussion of his FMLA cause of action by also proposing that the issue presented here is not whether Blake can miss work when his disability so requires, but whether he can call off from work at the last minute. Thus, as framed by the parties' arguments, Blake's status as a qualified individual is dependent on whether the undisputed facts demonstrate that his inability to regularly and predictably adhere to a full-time

work schedule means that he cannot perform an essential function of a phlebotomist position.[3]

Generally speaking, regular attendance is a job requirement.  See Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001) (employee who does not come to work on regular basis not qualified under ADA); Meyers v. Conshohocken Catholic School, No. Civ.A. 03-4693, 2004 WL 3037945, at *9 (E.D.Pa. December 30, 2004) (school not required to accommodate teacher's illness to permit her "to miss work whenever and for however long she was ill"); Veltri v. Thompson Consumer Electronics, No. 3:CV-02-0645, 2004 WL 1490522, at *5 (M.D.Pa. May 18, 2004) (regular attendance is essential function of job).

Obviously, phlebotomists employed by UPMC cannot perform their primary duty of collecting blood and specimens from patients if they are not at the hospital.  Sharon Hoey ("Hoey"), Blake's immediate supervisor, explained that when a phlebotomist is absent, the workload is redistributed among other laboratory personnel, including some employees without specific  phlebotomist training.  In some situations, this personnel shortage can cause a backlog resulting in complaints from physicians and, more significantly, hardship to certain patients.

While Blake offers that his unscheduled absences did not pose a problem to the hospital during his previously-granted intermittent leave periods, the undisputed evidence contradicts this assertion.  During Blake's leave period, Hoey began fielding complaints from his

---

[3] "Essential functions" are defined under the ADA as the "fundamental job duties" of a particular position. 29 C.F.R. § 1630.2(n)(1).  Evidence that a certain function is essential can include: "(1) the employer's judgment as to what functions of a job are essential; (2) the amount of time spent on the job performing a particular function; (3) the consequences of not requiring the job holder to perform the function; and (4) the number of other employees available among whom the performance of a particular function may be distributed."  Gibson v. Lafayette Manor, Inc., No. 05-1082,  2007 WL 951473, at *7  n.11 (W.D.Pa. March 27, 2007)(citing 29 C.F.R. § 1630.2(n)(3)).

colleagues about the amount of work redistributed to them occasioned by Blake's absences.[4]

Kuzma, the laboratory manager, testified that Hoey relayed to him that Blake's absenteeism was causing staff shortages and that these absences necessitated reassignment of other technologists to assume Blake's duties. At some point, Kuzma informed Kooros that he was having difficulty staffing the department because of Blake's absences. This information prompted Kooros to investigate the situation which led to the discovery that Blake's leave was improvidently approved. Despite these workforce issues, Kuzma testified that hospital personnel did not take an affirmative position that Blake's intermittent leave would create a staffing problem.

This evidence shows that Blake's unexpected absences caused a personnel deficiency in the hospital laboratory that burdened the phlebotomists and other laboratory workers. Each time that Blake called in sick, a shortage occurred and his work had to be redistributed, sometimes to employees without the appropriate training. The fact that Blake's colleagues complained to their supervisor about the increased workload contradicts Blake's position that the department functioned to UPMC's satisfaction during his intermittent leave period. It is of no matter that some of his absences were sanctioned under the improperly-granted leave or while application of the attendance policy was temporarily suspended. While Hoey did not raise an objection to Blake's intermittent leave status, she explained that she did not have the authority to question its feasability. It is also true that, although Kuzma never himself expressed or heard an opinion that Blake's intermittent leave would create a staffing problem, this lack of spoken objection is not probative of the precise issue of whether Blake's missing

---

[4] Blake himself noted in his January 21, 2004 letter to Kooros and Kuzma that he finds his job more difficult on those days when the department is understaffed. See text, supra at 4.

work periodically and without notice unduly burdened the functioning of the hospital laboratory. According to the laboratory personnel, his absences unquestionably caused difficulty to others in the workplace.

Additionally, UPMC's prior allowance of intermittent leave and excusal of some absences while assessing Blake's request for accommodation, does not translate to a concession that regular attendance is not an essential function of a phlebotomist position. Likewise, a failure to articulate that the leave caused a burden does not yield UPMC's position that attendance is crucial. See Laurin v. Providence Hospital,150 F.3d 52, 61 (1st Cir. 1998) (employer does not concede that job function is "non-essential" by voluntarily assuming limited burden associated with temporary accommodation, nor thereby acknowledge that burden as permanent accommodation would not be unduly onerous) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir.1996) (employer's temporary creation of "new" position for ADA plaintiff is irrelevant to "essential function" inquiry)). Whether UPMC was willing to temporarily tolerate the increased workload on its other employees is an inquiry distinct from whether permanently accepting the burden on the laboratory functioning is mandated by the ADA.

The answer to that question is that the ADA does not require UPMC to provide Blake with a job that he cannot perform because of his erratic attendance, even though the absences are due to a disability. The staffing shortages caused by Blake's absenteeism compromised the efficient functioning of the hospital laboratory and encumbered the other laboratory workers. Blake's inability to attend work with any degree of predictability and reliability shows that he cannot perform an essential function for the job for which he was hired. For this reason, Blake is not a qualified individual under the ADA, and it is recommended that

summary judgment be granted to UPMC on counts one and two of the complaint.

D. FMLA Count

Count three of Blake's complaint alleges that UPMC both interfered with his exercise of FMLA rights and terminated his employment in retaliation for assertion of those statutory rights.

Under 29 U.S.C. § 2611 (2)(A)(i)(ii), an employee becomes eligible for FMLA rights after he has been employed for "at least 12 months by the employer with respect to whom leave is requested" and "for at least 1,250 hours of service with such employer during the previous 12-month period." It is undisputed that when Blake was granted intermittent leave on October 7, 2003, he had not worked the requisite number of hours to be considered a FMLA-eligible employee. When, if ever, he reached the 1250-hour threshold remains an outstanding issue of fact. Both parties submit unsupported statements in this regard that are of little assistance to the court. However, since the record is viewed favorably to Blake, it is assumed for summary judgment purposes that at some point after mid-January 2004, Blake had worked a sufficient amount of hours to meet the eligible employee definition.

In order to assert a claim of interference, Blake must show that he was entitled to FMLA benefits and that UPMC illegitimately prevented him from obtaining those benefits. 29 U.S.C. § 2615(a); Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). To prove a *prima facie* case of retaliation Blake must show that "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and, (3) the adverse decision was causally related to his leave. Conoshenti, 364 F.3d at 146. Thus, to survive summary judgment under either theory,

15

Blake must demonstrate that he either took or that he was entitled to take FMLA leave.

As described, although Blake's leave from October to mid-January was FMLA-classified, it had been incorrectly designated as such. When Blake was informed that the leave was mistakenly granted and was being revoked, the discussion turned to whether Blake could qualify for an accommodation under the ADA. Therefore, at no point was Blake actually on FMLA leave. Nor, for the reason discussed below, was he entitled to same.

When an employee returns from FMLA leave, he is entitled to the same position he held when leave commenced, or to a position with equivalent benefits, pay, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1)(A); 29 C.F.R. § 825.214(a); Callison, 430 F.3d at 119. But an employee is not entitled to restoration to a prior or an equivalent position if he is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition. 29 C.F.R. § 825.214(b); Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002). As contrasted to the ADA, the employer has no obligation under FMLA to accommodate an employee's health condition to enable him to perform an essential function of his job. Reifer v. Colonial Intermediate Unit 20, 462 F.Supp.2d 621, 637 (M.D.Pa. 2006) (citing Rinehimer, id.). See also Hatchett v. Philander Smith College, 251 F.3d 670, 677-78 (8th Cir. (2001) (FMLA protects employee who must leave work, or reduce work schedule for medical reasons, as long as employee can perform job).

It has already been determined that Blake's disability precludes him from achieving the regular attendance incumbent to performance of a phlebotomist position. It is also undisputed that his disability is permanent. Thus, the critical question of whether Blake could

perform the essential functions of his job upon return from FMLA leave, if granted, has already been decided.  He cannot and will never be able to satisfy a phlebotomist's job requirements. Knowing this at the outset, UPMC would not be obligated to extend FMLA leave to Blake. Accordingly, Blake cannot meet the threshold requirement that he was either on or was entitled to FMLA leave to establish a *prima facie* case under either an  interference or  retaliation theory. It is, therefore, recommended that summary judgment be granted to UPMC on count three of the complaint.

As regards the individual defendants, the Court of Appeals for the Third Circuit has yet to decide the issue of individual liability under FMLA.  However, a number of district courts have concluded that FMLA permits individual liability.  See Matukaitis v. Pennsylvania Coalition Against Domestic Violence, No. 4:CV 05-1146, 2005 WL 2989865, at **3-4 (M.D.Pa. November 8, 2005) (denying individual defendant's motion to dismiss FMLA action by employees of  Pennsylvania non-profit corporation); Hewett v. Willingboro Board  of Education, 421 F.Supp.2d 814, 817-18 (D.N.J. 2006) (public employees may be held liable under FMLA) ; Calvados v. County of Luzerne, 52 F.Supp.2d 403, 416 (M.D.Pa.1999) (plain language of the FMLA evinces intent to provide for individual liability); See also 29 C.F.R. § 825.104(d) (person acting in the interest of employer is individually liable for FMLA violations).  However, as it has been determined that FMLA was not violated, summary judgment is also recommended in favor of Kuzma and Kooros on count three.

E.  Intentional Infliction of Emotional Distress

In count four of the complaint, Blake alleges that the facts previously pled in support of his claims under the ADA, PHRA, and FMLA, also demonstrate that his employer's

conduct constituted intentional infliction of emotional distress.

Intentional infliction of emotional distress is a state tort governed by Pennsylvania law. <u>Cox v. Keystone Carbon Company</u>, 861 F.2d 390, 394 (3d Cir. 1988). Under the exclusivity provision of the Pennsylvania Workmen's Compensation Act ("WCA"), Pennsylvania's employers are immune from employee lawsuits for most injuries sustained in the workplace. The section provides that "the liability of an employer . . . shall be exclusive and in place of any and all other liability to . . . employes . . . ." 77 P.S.§ 481(a).

Although it has not directly spoken on a claim against an employer for intentional infliction of emotional distress, the Pennsylvania Supreme Court has held generally that the WCA bars an employee's recovery for intentional torts. <u>Poyser v. Newman & Company, Inc.</u>, 514 Pa. 32, 38, 522 A.2d 548, 551 (1987). Some federal courts have interpreted <u>Poyser</u> to foreclose employee's litigation of intentional infliction of emotional distress claims against employers. <u>See Cardamone v. Murray Management, Inc.</u>, No. Civ.A. 3:05-CV-0679, 2005 WL 3478320, at *3 (M.D.Pa. 2005) (plaintiff's intentional infliction of emotional distress against employer claim barred by holding in <u>Poyser)</u>; <u>Heintz v. Fayette County Area Vocational Technical School</u>, Civil Action No. 07-1174, at *3 (W.D.Pa. 2007) (same). Additionally, in <u>Matczak v. Franklin Candy and Chocolate Company</u>, 136 F.3d 933 (3d Cir. 1997), the Court of Appeals for the Third Circuit held that the WCA provides the sole remedy for injuries allegedly sustained during the course of employment and that the statute's exclusivity provision bars a claims for intentional infliction of emotional distress arising out of an employment relationship. <u>Id.</u> at 940.

The only argument proposed by Blake to suggest that this tort claim is not

foreclosed by the WCA is language from a case predating the aforementioned authority, noting that neither the Pennsylvania Supreme Court nor the Third Circuit has specifically interpreted the WCA to preclude an intentional infliction of emotional distress claim against an employer.  See Welcker  v. Smithkline Beckman, 746 F.Supp. 576, 581 (E.D.Pa. 1990) (unclear if Pennsylvania Supreme Court or, in absence of ruling from that court, the Third Circuit will interpret the WCA to preclude intentional infliction of emotional distress cause of action).  Given that the Third Circuit announced in Matczak that the WCA's exclusivity provision bars employment-related claims for intentional infliction of emotional distress and the contrary position of later-decided federal court opinions interpreting Poyser to preclude same, Welcker is not persuasive.

Blake's claim for intentional infliction of emotional distress could nonetheless be cognizable if he were able to identify objectionable conduct that fits into the narrow exception to the WCA exclusivity rule.  Known as the personal animus exception, the WCA instructs that injuries arising in the course of employment do not include those "caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment . . . ."  77 P.S. § 411(1); Kohler v. McCrory Stores, 532 Pa. 130, 136, 615 A.2d 27, 30 (1992).

Other than baldly asserting that he would be prepared to present evidence of personal animus to the jury, Blake does not proffer any facts that the individual defendants displayed any personal animosity towards him.  For this reason, it is recommended that summary judgment be granted in Kuzma's and Kooros's favor on count four of the complaint.

F.  Retaliatory Discharge

Count five of Blake's complaint simply incorporates its previous paragraphs and avers that those aforementioned facts "constitute the state tort of retaliatory discharge and/or wrongful discharge contrary to public policy." Plaintiff's Complaint, ¶ 43, (Document #1). Blake further charges in his brief that the defendants retaliated against him for exercising his ADA and FMLA rights, and that these actions represented a violation of public policy sufficient to support a wrongful discharge claim under Pennsylvania law. Pennsylvania law generally does not recognize a common law cause of action for the wrongful discharge of an at-will employee. Geary v. United States Steel Corporation, 456 Pa. 171, 174, 319 A.2d 174 (1974); Borse v. Piece Goods Shop, Inc. 963 F.2d 611, 614 (3d Cir.1992). Narrow exceptions have been recognized in circumstances where discharge of an at-will employee threatens or violates a clear mandate of public policy of the Commonwealth. McLaughlin v. Gastrointestinal Specialists, Inc., 561 Pa. 307, 314, 750 A.2d 283, 287 (2000). A "clear mandate" of public policy must be of a type that "strikes at the heart of a citizen's social right, duties and responsibilities." Novosel v. Nationwide Insurance Company, 721 F.2d 894, 899 (3rd Cir.1983)(citation omitted).

Pennsylvania courts have identified some instances where an employee has been terminated in violation of public policy sufficient to constitute a cause of action for wrongful discharge. See Rothrock v. Rothrock Motor Sales, Inc., 584 Pa. 297, 883 A.2d 511 (2005) (employee fired for refusing to dissuade another from pursuing workers' compensation claim); Shick v. Shirey, 552 Pa. 590, 716 A.2d 1231 (1998) (plaintiff discharged for filing workers' compensation claim); Kroen v. Bedway Security Agency, 633 A.2d 628 (Pa.Super. 1993) (employee fired for refusing to take polygraph test disallowed by statute). However, these public policy exceptions do not ordinarily apply where statutory remedies are available. Novosel, 721

F.2d at 898.

In <u>McLaughlin</u>, the Pennsylvania Supreme Court held that to succeed in a claim for wrongful discharge "a Plaintiff must do more than show a possible violation of a federal statute that implicates only her own personal interest. The Plaintiff in some way must allege that some *public* policy of *this* Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee." 561 Pa. at 317, 750 A.2d at 289 (emphasis in original). Thus, to the extent that Blake's retaliatory/wrongful discharge claim is premised solely on violation of rights guaranteed by ADA and FMLA, he had other remedies available to him to seek redress for that injury.

Without amplification, Blake also submits a one-sentence position that the defendants' discriminatory actions violated the equal protection clause of the Pennsylvania Constitution and, in turn, a public policy of the Commonwealth. Because the contours of this claim are so vaguely outlined, as best as can be analyzed, this claim is precluded because the PHRA, which is applicable herein,[5] is the exclusive statutory remedy for wrongful discharge on the basis of discrimination. <u>Clay v. Advanced Computer Applications</u>, 522 Pa. 86, 89, 559

_____

[5] The Pennsylvania Supreme Court has granted allocatur to decide whether an employer, who does not employ the requisite number of employees to come under the umbrella of mandated-PHRA compliance, is liable for a common law cause of action for discriminatory termination of at-will employment. <u>Weaver v. Harpster</u>, 885 A.2d 1073 (Pa. Super. 2005), <u>allocatur granted</u>, 592 Pa. 13, 922 A.2d 876 (April 26, 2007).

A.2d 917, 918 (1989); see also Diberardinis-Mason v. Super Fresh, 94 F.Supp.2d 626, 632 (E.D.Pa. 2000) (PHRA prohibits retaliation for opposing discrimination and also preempts common law claim for wrongful discharge based on alleged retaliation).  Accordingly, it is recommended that summary judgment be granted in favor of all defendants on count five of the complaint.

For these reasons, it is recommended that UPMC's and the individual defendants' motion for summary judgment (Docket #26) be granted on all counts of Blake's complaint (Docket #1).

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  *Amy Reynolds Hay*
United States Magistrate Judge


Dated:  7 March, 2008



cc:      Hon. Terrence F. McVerry
         United States District Judge

         All Counsel of Record by Notice of Electronic Filing